ADAMS, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.    5:16CR326 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Judge John R. Adams |
| TERRANCE FORD, | ) | |
| | ) | ORDER |
| Defendant. | ) | |
| | ) | |

Pending before the Court is Defendant Terrance Ford's motion for compassionate release.

Doc. 88.   The matter had been fully briefed, and the Court now reviews Ford's arguments.   Upon

review, the motions are DENIED.

Within the COVID-19 backdrop, the Sixth Circuit has recently explained this Court's

duties and obligations when considering a motion for compassionate release.

> Sections 3582(c)(1)'s and (c)(2)'s parallel language and structure compel us to
> conclude that compassionate release hearings are sentence-modification
> proceedings and that courts considering motions filed under § 3582(c)(1) must
> follow a *Dillon*-style test. The three-step § 3582(c)(1)(A) test is as follows. At step
> one, a court must "find[ ]" whether "extraordinary and compelling reasons warrant"
> a sentence reduction. 18 U.S.C. § 3582(c)(1)(A)(i). At step two, a court must "find[
> ]" whether "such a reduction is consistent with *applicable* policy statements issued
> by the Sentencing Commission." *Id.* § 3582(c)(1)(A) (emphasis added).  The
> Commission's policy statement on compassionate release resides in U.S.S.G. §
> 1B1.13. *See* U.S.S.G. § 1B1.13 (U.S. Sent'g Comm'n 2018). Thus, if § 1B1.13 is
> still "applicable," courts must "follow the Commission's instructions in [§ 1B1.13]

to determine the prisoner's eligibility for a sentence modification and the extent of the reduction authorized." At step three, "§ 3582(c)[ (1)(A) ] instructs a court to consider any applicable § 3553(a) factors and determine whether, in its discretion, the reduction authorized by [steps one and two] is warranted in whole or in part under the particular circumstances of the case."

*United States v. Jones*, 980 F.3d 1098, 1107–08 (6th Cir. 2020)(citations and footnotes omitted). However, "[i]n cases where incarcerated persons file motions for compassionate release, federal judges may skip step two of the § 3582(c)(1)(A) inquiry and have full discretion to define 'extraordinary and compelling' without consulting the policy statement § 1B1.13." *Id.* at 1111.

Initially, the Court notes that it would be within its discretion to deny Ford's motion based upon the fact that there are zero positive cases among inmates currently at his place of incarceration, FCI Elkton.  *See United States v. Elias*, 984 F.3d 516, 521 (6th Cir. 2021) (finding that it was not an abuse of discretion to deny compassionate release when Alderson had no reported cases and therefore only presented a speculative risk to the movant).   The Court, however, will also review the 3553(a) factors as they further support denial of the pending motion.

       I.      § 3553(a) Factors

          a.  Standard

As noted above, this Court may "not modify a term of imprisonment once it has been imposed" unless specifically authorized to do so by section 3582(c). This Court may grant compassionate release if, after considering the factors in 18 U.S.C. § 3553(a), it determines that "extraordinary and compelling reasons" warrant a reduced sentence and that "such a reduction is consistent with applicable policy statements issued by the sentencing commission." 18 U.S.C. § 3582(c)(1)(A)(i). For ease of reference, the § 3553 factors are as follows:

(a) Factors to be considered in imposing a sentence.--The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for—

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—

18 U.S.C.A. § 3553.

The Sixth Circuit has noted that "District judges maintain an obligation to provide reasons"

when resolving motions for compassionate release.  *Jones*, 980 F.3d at 1112.

We start by requiring a thorough factual record for our review: district courts must supply specific factual reasons, including but not limited to due consideration of the § 3553(a) factors, for its compassionate release decision. We look at the whole record in sentence-modification proceedings, including the records from the original sentencing, records on the modification motion, and the final compassionate release decision.

*Id.* (citations, quotations, and alterations omitted).

3

b.  Analysis

Ford's motion focuses upon his medical conditions – Type II diabetes and hypertension – to assert that

> his current sentence poses a much greater risk of death or serious injury than was previously understood, 18 U.S.C. § 3553(a)(1); (3) the need to provide appropriate medical care is much higher, 18 U.S.C. § 3553(a)(2)(D), and (4) the kinds of sentences available without relief—specifically, the lack of programming, and the other restrictions the BOP has placed on prisoners—are more serious than the Court knew when it sentenced him, 18 U.S.C. § 3553(a)(3).

Doc. 88 at 5-6.

While the Court acknowledges that programming available in the Bureau of Prisons may currently be reduced, the Court cannot agree that the combination of factors presented by Ford warrant reducing his sentence.   At this time, Ford has roughly 49 months remaining of his 120-month sentence.   A review of why the Court imposed such a sentence serves to support the Court's review that compassionate release is not warranted.

In April of 2016, Akron police began receiving complaints about drug activity at a residence shared by Ford and his co-defendant, Brian Williams.   Ultimately, police received sufficient information to search the residence.   During the search, police seized a variety of illegal substances.

> 18. The suspected drugs were submitted to Ohio BCI&I for testing. One (1) plastic bag containing powder - 56.58 g +/- 0.09 g – was found to contain Fentanyl. Three (3) plastic bags containing powder - 68.94 g +/- 0.09 g were found to contain Heroin and Fentanyl.
> 19. The 29 dosage units of Fentanyl, each containing .50 grams, total 14.50 grams were submitted to the Akron Police Department, Forensic Laboratory. One unit was tested and was found to contain Fentanyl. The Akron Police Forensic Lab also tested the 66 white tablets of Oxycodone, 33.30 grams, and found Oxycodone present. Finally, Akron Police Forensic Laboratory tested, eight green pills

4

recovered and found they contained Alprazolam (Xanax), 2.4 grams.

20. The total amount of Fentanyl found was estimated to be 140.02 grams.

Doc. 36 at 5.

To try to place Ford's conduct into perspective, it is important to first note that the average lethal dose of fentanyl is 2 to 3 grams.   At the time of the search, therefore, had sufficient fentanyl in his possession to provide lethal doses to more than 45 people.   That is to say nothing of the amount of fentanyl that Ford's conduct caused to flow into the community prior to his arrest. During Ford's sentencing, the Court took great pains to demonstrate that Ford's drug house was less than a mile from three different schools.   Only enhancing the risks to the public that he was creating through drug trafficking.

The Government also outlined the risks associated with fentanyl during Ford's sentencing:

Law enforcement has to take special precautions when dealing with this particular drug so that they don't overdose by just attempting to field test it or deal with it in any way, shape, or form.

This drug, even when absorbed through the skin when law enforcement comes in contact with it, or anyone comes in contact with it, can be fatal.

As the Court's probably well aware, there is no -- with the synthetic fentanyl, there is no therapeutic dose of it. A quarter gram, in one of the cases that we currently have, overdosed. Guy dropped dead right there. A quarter gram.

Doc. 65 at 73.

In turn, this Court outlined the scope of the harm flowing from drug trafficking like that Ford engaged in:

All of the items that were discovered in the search help and assist in determining the scale of this drug activity, this drug operation.

5

It is not a small one. It is the type of drug activity that is leading to the death of many people in our communities. And it is leading to and addressing -- when I say this, it is also, along with certainly the death of many, many, many individuals, individuals like Mr. Ford are creating an extraordinary burden on the lives of many, of addicts, of families who lose their loved ones, of law enforcement who are at risk when they have to engage in these type of investigations as we've heard, of paramedics and others who are called upon to try and come to the scene and rescue those who are overdosing, medical facilities, emergency rooms, hospitals and doctors who are overburdened with trying to deal with the vast influx of these addicts who are coming to the emergency rooms, who the doctors and other professionals have to work to try to save in some respects to the detriment of other patients who may be called upon to wait, the extraordinary cost to the communities of all of these activities. And Mr. Ford is an integral part of this activity.

Doc. 65 at 77-78.   The Court then continued on, noting that the advisory guideline range of 46 to 57 months was insufficient to meet the goals of the sentencing statute.

While the pandemic may have increased the risks to Ford while incarcerated and limited the programming available to him, such facts pale in comparison to the risks Ford created with his drug trafficking and the harm he inflicted upon the community.   Moreover, Ford's conviction was not his first foray into the world of drug trafficking.   In 1994, Ford served eight years in prison for aggravated drug trafficking.   He was released in 2002. Less that two years later, Ford was convicted of possession of cocaine and sentenced to another year in prison.   Ford was released from that period of incarceration in July of 2005.   By April of 2006, Ford was again charged with a felony – having weapons while under disability.   Ford was again sentence to one year in prison for this conviction.   All of those sentences, including his eight-year sentence, have not served to deter Ford from returning to drug trafficking.

As such, this Court cannot say that Ford's to-date fifty-one-month sentence is sufficient to deter him from future misconduct.   Moreover, such a sentence does not adequately reflect the

6

seriousness of Ford's offense, nor does it properly protect the public.    Accordingly, Ford's motion for compassionate release is not well taken.

Based upon a review of the totality of the factors listed in § 3553(a), the Court hereby DENIES Ford's motion for compassionate release.

IT IS SO ORDERED.

February 16, 2021                                  /s/John R. Adams                                    
Date                                                    JOHN R. ADAMS
                                                           UNITED STATES DISTRICT JUDGE\